UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHAD EICHENBERGER, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>ESPN, INC., a Delaware corporation,<br><br>                    Defendant. | Case No.<br><br><br>**SUMMONS** |

Plaintiff Chad Eichenberger ("Eichenberger") brings this case individually and on behalf of all others similarly situated against Defendant ESPN, Inc. ("ESPN") to put an end to ESPN's wrongful practice of disclosing its users' sensitive information, and to obtain redress for such conduct. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.      ESPN is one of the largest producers of sports-related news and entertainment programming in the world. Perhaps best known for its eponymously named television channel, ESPN also offers content to consumers via other media including its proprietary software

COMPLAINT — CLASS ACTION         - 1 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

application (the "WatchESPN Channel") that it developed for use with a digital media-streaming device called the Roku.[1]

2.     Unbeknownst to ESPN users, each time they use the WatchESPN Channel to watch a music video or other content, ESPN knowingly discloses their personally identifiable information—including a record of every video clip viewed by the user (collectively, "PII")—to unrelated third parties. In addition to demonstrating a disregard for its users' privacy rights, ESPN's actions also violate the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits companies from disclosing their customers' video viewing records to third parties without express written consent.

3.     ESPN's violations of the VPPA are particularly flagrant here, as it programmed the WatchESPN Channel to transmit users' PII to a third-party data analytics company. The business models of such "big data" analytics companies center on the collection of disparate pieces of uniquely identifying information and online behavioral data about individual consumers, which they then compile to form comprehensive profiles about a person's entire digital life. These profiles can then be used for targeted advertising, sold as a commodity to other data brokers, or both.

4.     In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information. ESPN chose to disregard Plaintiff's and thousands of other users' statutorily protected privacy rights by releasing their sensitive data into the marketplace.

**PARTIES**

5.     Plaintiff Chad Eichenberger is a natural person and citizen of Washington.

6.     Defendant ESPN, Inc. is a corporation existing under the laws of the State of Delaware with its principal place of business located at 935 Middle Street, Bristol, Connecticut 06010. ESPN conducts business throughout this District, the state of Washington, and the United

---

[1]     Roku is a digital media-streaming device that delivers videos, news, games, and other content to consumers' televisions via the Internet.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

States.

## JURISDICTION AND VENUE

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 as this action arises under the VPPA. This Court has personal jurisdiction over ESPN because ESPN conducts business in this District and the wrongful conduct occurred in, was directed to, and/or emanated from this District.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b) because ESPN conducts business in this District; the improper conduct alleged in this Complaint occurred in this District; the injury arose in this District; and Plaintiff resides in this District.

## FACTUAL BACKGROUND

**I.     ESPN Programmed the WatchESPN Channel to Transmit Users' PII and Video Viewing Activity to a Third-Party Data Analytics Company Without Users' Consent.**

9.     The WatchESPN Channel is a digital software application that allows consumers to view ESPN's sports-related news and entertainment programming on their televisions via the Roku media-streaming device.

10.     To install the application on a Roku, users must visit the Roku Channel Store—Roku's proprietary online digital media platform where users can download applications (called "channels") that allow them to view specific television shows or video clips on their devices.

11.     Once downloaded and installed, and upon opening the application, the WatchESPN Channel presents the user with a main home screen that allows the user to view certain of ESPN's proprietary video programming. (*See* Figure 1, below, showing the WatchESPN Channel's main homescreen.)

COMPLAINT — CLASS ACTION                - 3 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752





(Fig. 1.)

12.    At no time during this process, however, does ESPN seek or obtain the consent of the user to share or otherwise disclose his or her PII to third parties for any purpose.

**A.    The WatchESPN Channel sends its users' video viewing activity and uniquely identifying PII to the third-party data analytics company Adobe.**

13.    The WatchESPN Channel is organized into certain categories that are accessible through the software's main user interface. (*See* Figure 1 above; *see also* Figure 2 below, showing the WatchESPN Channel's graphical user interface.) Users may browse through these sections to view sports-related events, news, and ESPN's own proprietary entertainment

COMPLAINT — CLASS ACTION                    - 4 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

programming. (*See id.*)



(Fig. 2.)

14.     Unbeknownst to its users, however, each time they view a video clip, the WatchESPN Channel sends a record of such activities to an unrelated third-party data analytics company called Adobe.[2] The complete record is sent each time that a user views a video clip, along with the serial number associated with the user's Roku device.

## II.     Data Analytics Companies Rely on Unique Identifiers Associated with Digital Devices to Create Dossiers On Consumers and Their Digital Behaviors.

15.     Today's average consumer uses more than one device to access the Internet to do things like view digital content or make online purchases. This creates challenges for online advertisers and data analytics companies. Namely, to gain a broad understanding of a given consumer's behavior across all of the devices and applications that a user uses, these companies have to find ways to "link" their digital personas. The primary solution has been to use certain unique identifiers to connect the dots.

---

[2]     Adobe is a company that offers data analytics and online marketing services that it claims "allow [its] customers to create groundbreaking digital content, deploy it across media and devices, measure and optimize it over time, and achieve greater business success." *See* Adobe Company, http://www.adobe.com/company.html?promoid=JZPLK (last accessed March 25, 2014). Using its services, Adobe says, helps companies "make, manage, measure, and monetize their content across every channel and screen." *Id*.

COMPLAINT — CLASS ACTION          - 5 -

16.     The key to successfully tracking an individual's digital behavior is to precisely identify the person and link their activities across their devices and applications. To do this, data analytics companies—like Adobe—rely in part on creating user identities from information supplied by device manufacturers.

17.     An example of a device manufacturer supplied user identity in the consumer electronics context is a device's serial number. That's because device serial numbers are "persistent identifiers," meaning they are unique to a specific device and remain constant for the lifetime of the user's device. In other words, once a Roku serial number is matched with an individual's identity, it's exceedingly difficult for that person to avoid being tracked via their device—making it among the most stable and reliable identifiers for a given individual.

**A.      Adobe and other data analytics companies maintain massive digital dossiers on consumers.**

18.     Once a consumer's identity is matched with their device's serial number (or other "persistent identifier"), a wealth of extremely precise information can be gleaned about the individual. For instance, software applications that transmit a Roku's serial number along with the user's activity provide an intimate look into how the user interacts with their channels, which can reveal information such as the user's political or religious affiliation, employment information, articles and videos viewed, and even detail about the sequence of events in which the user interacts with their Roku.

19.     An excerpt from Adobe's marketing materials, shown in <u>Figure 3</u> on the following page, accurately portrays the frightening array of information that feeds into a consumer's digital dossier using data transmitted from sources such as their digital devices.

*                    *                    *

COMPLAINT — CLASS ACTION                    - 6 -

(Fig. 3.)

20.     Figure 3 provides insight into the depth of information captured by Adobe's data analytics services. Of particular note are the "sources" of consumer data in the far right column. The graphic's references to these sources—including "Web Analytics" and "Customer Data Warehouse[s]"—implicate software applications (like WatchESPN's for the Roku) that collect consumer data. From such sources, Adobe is able to amass the wealth of information shown on the left in Figure 3. That information includes things like: a person's name, address, age, phone number, email, purchase history, behavioral activity, and income.

**B.      The President and Congress are responding to growing privacy concerns over the collection and misuse of personal information in the digital marketplace.**

21.     Concerns over the privacy risks associated with the collection and transmission of PII from digital devices to third parties is no longer just academic musing. In a recently issued sixty-two page policy memo, President Obama squarely addressed the issue, stating that there's a growing problem with consumers' privacy "in the age of the Internet, the World Wide Web and

COMPLAINT — CLASS ACTION                    - 7 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

smartphones."[3] While the President's memo provided a "blueprint" for protecting consumers' privacy, he called on Congress to take the lead and pass legislation to curb behavior related to the corporate exploitation of user data.

22.     For its part, Congress has started to take up these issues as well. In 2011, Senators Patrick Leahy and Al Franken established the United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology, and the Law that, among other things, oversees the laws and policies governing (i) the collection, protection, use and dissemination of commercial information by the private sector, including online behavioral advertising, privacy within social networking websites and other online privacy issues, (ii) privacy standards for the collection, retention, use and dissemination of personally identifiable commercial information, and (iii) privacy implications of new or emerging technologies.[4]

23.     In establishing this Subcommittee, Senator and Subcommittee Chair Al Franken noted that "[t]he boom of new technologies over the last several years has made it easier to keep in touch with family, organize a community and start a business . . . It has also put an unprecedented amount of personal information into the hands of large companies that are unknown and unaccountable to the American people."[5]

24.     Members of other subcommittees have made similar remarks. In a meeting of the Subcommittee on Consumer Protection, Product Safety, and Insurance, Senator John Rockefeller noted that, "third parties use [consumer data] to target advertising on individuals . . . It is very

---

[3]     Consumer Data Privacy In a Networked World: A Framework for Protecting Privacy and Promoting Innovation in the Global Digital Economy, http://www.whitehouse.gov/sites/default/files/privacy-final.pdf (last accessed March 5, 2014).

[4]     United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/about/subcommittees/privacytechnology.cfm (last accessed March 5, 2014).

[5]     Sen. Franken To Chair New Subcommittee on Privacy, Technology and the Law, http://www.franken.senate.gov/?p=hot_topic&id=1315 (last accessed March 5, 2014).

COMPLAINT — CLASS ACTION              - 8 -

good business, but it is very cynical. It is an abuse of that power, passing on people's profiles."[6]

25.   In response to the increased scrutiny on consumers' privacy concerns, companies are also starting to change their data collection and usage practices. For instance, in the release of Apple's most recent mobile device operating system, iOS 7, Apple discontinued the ability to transmit certain personally identifiable information to third parties for tracking purposes.[7]

26.   Despite the controversy surrounding these methods of harvesting and commodifying sensitive consumer data, ESPN chose to disclose users of its WatchESPN Channel's sensitive information to the third-party data analytics company Adobe.

**III.   The VPPA's Importance in the Digital Age.**

27.   When the VPPA was introduced, the late Senator Paul Simon noted that, "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes." S. Rep. No. 100-599 at 7-8 (1988). Senator Patrick Leahy, one of the original drafters of the VPPA, also remarked that, "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 8.

28.   While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern computing era is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized this point, saying that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our

---

[6]   S. Hrg. 112-289, Consumer Privacy and Protection in the Mobile Marketplace, http://www.gpo.gov/fdsys/pkg/CHRG-112shrg73133/html/CHRG-112shrg73133.htm (last accessed February 17, 2014).

[7]   iOS 7 Eliminates MAC Address as Tracking Option, Signaling Final Push Towards Apple's Own Ad Identifier Technology, http://techcrunch.com/2013/06/14/ios-7-eliminates-mac-address-as-tracking-option-signaling-final-push-towards-apples-own-ad-identifier-technology/ (last accessed March 5, 2014).

COMPLAINT — CLASS ACTION                - 9 -

fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[8]

29.    Likewise, Senator Al Franken summed up the importance of the VPPA in today's world as follows: "[i]f someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."

**IV.    Plaintiff Eichenberger's Experience with the WatchESPN Channel.**

30.    Starting in early 2013, Plaintiff Eichenberger downloaded and began using the WatchESPN Channel on his Roku media-streaming device to watch sports-related events and news.

31.    At no relevant time did Eichenberger consent, agree, or otherwise permit ESPN to disclose his PII to any third-party data analytics companies.

32.    Likewise, Eichenberger has never been given the opportunity to prevent the WatchESPN Channel from disclosing his PII to third parties.

33.    Nevertheless, each time Eichenberger viewed a video clip using the WatchESPN Channel, ESPN knowingly disclosed his PII to the third-party data analytics company Adobe.

CLASS ALLEGATIONS

34.    **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who used the WatchESPN Channel to watch videos and who had their PII transmitted to Adobe.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors,

---

[8]    The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/hearings/hearing.cfm?id=f14e6e2889a80b6b53be6d4e412d460f (last accessed February 17, 2014).

COMPLAINT — CLASS ACTION                          - 10 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax: (425) 732-3752

predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

35. **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. Class members can be easily identified through Defendant's records.

36. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a) Whether Defendant, through the WatchESPN Channel, unlawfully disclosed and continues to unlawfully disclose its users' personally identifiable information, including their video viewing records, in violation of 18 U.S.C. § 2710(b);

b) Whether Defendant violated the VPPA;

c) Whether Defendant disclosed Plaintiff's and Class members' personally identifiable information without their consent; and

d) Whether Defendant violated Plaintiff's and Class members' right to privacy.

37. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class.

38. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in

COMPLAINT — CLASS ACTION                    - 11 -

complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class.

39.     **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

40.     **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to

COMPLAINT — CLASS ACTION                          - 12 -

all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

41.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION

## Violations of 18 U.S.C. § 2710

## (on behalf of Plaintiff and the Class)

42.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

43.     Defendant is a "video tape service provider[]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), because it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its WatchESPN Channel.

44.     Plaintiff is a "consumer" as defined by the VPPA because he downloaded, installed, and watched videos using the WatchESPN Channel. 18 U.S.C. § 2710(a)(1). Under the Act, he was a "subscriber" of "goods or services from a video tape service provider." *See id*.

45.     While the WatchESPN Channel was installed on his Roku, Plaintiff viewed numerous video clips using the channel. During these occasions, ESPN, by means of the WatchESPN Channel, knowingly sent Plaintiff's PII—including his Roku's serial number and records identifying the videos that he viewed—to the third-party data analytics company Adobe.

46.     The WatchESPN Channel's transmissions of Plaintiff's PII to Adobe constitutes "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

47.     Under the VPPA, the term "personally identifiable information" "includes

COMPLAINT — CLASS ACTION                    - 13 -

information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

48.    The National Institute of Standards and Technology ("NIST") defines "personally identifiable information" as "any information that can be used to distinguish or trace an individual's identity."[9] As described in detail in Section II above, Plaintiff's PII transmitted to Adobe from the WatchESPN Channel can be used to distinguish or trace his identity.

49.    At no time did Plaintiff ever provide ESPN with any form of consent—either written other otherwise—to disclose his PII to third parties.

50.    Nor were ESPN's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the WatchESPN Channel's disclosures to Adobe were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

51.    As a result of Defendant's wrongful disclosures, Plaintiff and the Class have had their statutorily defined right to privacy violated. Plaintiff seeks an injunction to prohibit ESPN from releasing his and the Class's PII in the future, as well as the maximum statutory and punitive damages available under the VPPA. 18 U.S.C. § 2710(c).

**PRAYER FOR RELIEF**

Plaintiff Chad Eichenberger, on behalf of himself and the Class, respectfully requests that this Court enter an order:

A.    certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Eichenberger as representative of the Class his counsel as Class counsel;

B.    declaring that Defendant's actions, as set out above, violate the VPPA, 18 U.S.C.

---

[9]    NIST Guide to Protecting the Confidentiality of Personally Identifiable Information (PII), http://csrc.nist.gov/publications/nistpubs/800-122/sp800-122.pdf (last accessed February 17, 2014).

COMPLAINT — CLASS ACTION                          - 14 -

§ 2710;

C.   awarding injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful acts described herein;

D.   awarding damages, including statutory damages of $2,500 per violation, and punitive damages, where applicable, in an amount to be determined at trial pursuant to 18 U.S.C. § 2710(c);

E.   awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.   awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.   awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated March 28, 2014.                    Respectfully submitted,

LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
By: s/ *Cliff Cantor*
Cliff Cantor, WSBA # 17893
627 208th Avenue SE
Sammamish, Washington 98074
Tel:    425.868.7813
Fax:    425.732.3752
Email:  cliff.cantor@outlook.com

EDELSON PC
Jay Edelson*
Rafey S. Balabanian*
Benjamin H. Richman*
J. Dominick Larry*
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel:    312.589.6370
Fax:    312.589.6378

COMPLAINT — CLASS ACTION              - 15 -

Email:  jedelson@edelson.com
         rbalabanian@edelson.com
         brichman@edelson.com
         nlarry@edelson.com

Counsel for Plaintiff

*Admission *pro hac vice* to be sought.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, Washington 98074-7033
Tel: (425) 868-7813 • Fax:  (425) 732-3752